HEIRS OF ISABELO MANGUAL AYALA, ETC., Plaintiffs and Appellees, *v.* FRANK P. HASTINGS ET AL., Defendants; FRANK P. HASTINGS, Appellant.

No. 8017. Argued January 12, 1940.—Decided January 31, 1940.

*R. Castro Fernández* and *José López Baralt* for appellant; *C. Iriarte, F. Fernández Cuyar* and *H. González Blanes* for appellees.

Mr. Justice De Jesús delivered the opinion of the court.

Isabelo Mangual was run over by a motor car driven by its owner Frank P. Hastings and insured by Glenn Falls Indemnity Co. Mangual suffered the fracture of the base of the skull from which he died two days afterwards.

The heirs of Mangual brought the present action against Hastings and the insurance company to recover the damages alleged to have been suffered by reason of the death of their ancestor. Although the complaint did not prosper against the insurance company, it was sustained as to Hastings who was adjudged to pay to the plaintiffs $3,000 as compensation besides the costs and in addition $300 as attorney's fees. The defendant brought this appeal from the judgment and from the order approving the memorandum of costs, on the ground, as regards the judgment, that the trial court erred in weighing the evidence. The appellant admits that the evidence is conflicting but maintains that credit should have been given to his evidence because the theory of the appellees as to the way the accident occurred is physically impossible.

The position assumed by the appellant requires from us an analysis of the evidence for both sides. According to the appellees, Isabelo Mangual was a peasant who owned two acres of land which he tilled in person and with the produce thereof supported his family. On September 4, 1938, he took to the market place of Carolina the fruits from his farm and, having sold them, was preparing to return home together with some friends and relatives who were with him. Muñoz Rivera street is the prolongation of the Carolina-Canóvanas road and on its left side, close to the sidewalk and facing towards Canóvanas stood the car which Isabelo and his companions meant to take. Before occupying his seat, Mangual, who carried a bag containing two or three pounds of bread, meat, and candies for his children, tried to fasten the bag on the right side in front of the windshield of the car. In order to do this it was necessary for him to place himself on the right-hand side of the vehicle opposite

the sidewalk and while tying the bag, defendant's car, which was coming from Canóvanas exceedingly fast and without giving any warning with the horn, passed so close to the car near which Mangual was, that the latter was run over and thrown to the ground, receiving some injuries on the right shoulder and face, as well as having the base of his skull fractured. He was immediately taken to the Municipal Hospital of Carolina where he was confined from noon that day until the next day when he was removed to that of San Juan where he died the following day.

The defendant and appellant testified that he was driving his car at a moderate speed, sounded the klaxon when approaching the spot where deceased stood and passed about 4 or 5 feet from the latter, but that just as he was passing near deceased, the rope with which he was endeavoring to fasten the bag snapped, with the result that the deceased lost his balance, fell backwards against the appellant's car and received the injuries from which he died.

The witnesses for the plaintiff can not accurately describe how defendant's car came first in contact with the body of the victim. Some testified that Mangual was struck first on the knee, others that it was on the hip, and some that it was on the face, but all coincide in that he was struck on the right-hand side. As the doctors who attended him, first in Carolina and then in San Juan, testified that the above injuries were the only ones found on him, that is, on the shoulder, face and base of the skull, counsel for appellant draws the inference that the theory of the witnesses for the plaintiffs was physically impossible, because if the blow on the base of the skull was struck with the front mudguard, for such a thing to happen he must first have received a blow that would permit of the head of the deceased being hit by the mudguard because, as he was standing, his head was above the mudguard. The failure of the witnesses to be able to give an accurate description of how defendant's car came for the first time in contact with the body of the

victim does not necessarily mean that it was impossible for the accident to have occurred substantially as described by them. Might it not possibly be that in the confusion of the moment the witnesses were unable to notice every movement made by the victim to ward off the blow when he was suddenly confronted with a situation of imminent danger to him?

The theory of the defendant is not so convincing as maintained by his counsel. As already stated by us, the bag which the deceased was trying to fasten was light and, while trying to do that, he stood with both feet on the ground so that it was not necessary for him to exert much strength to do what he wanted. Conceding that the rope snapped, it is very improbable that the deceased might have fallen backwards, because he was, according to the evidence, a healthy and strong man, the more so since he did not have to assume an awkward position in order to fasten the bag in view of the height of the windshield. It is true that some of the witnesses for the plaintiff testified that the rope snapped and that at the moment of the accident the deceased was trying to tie it up; but they also stated that the rope was old and worn out.

According to the evidence for the appellees and the testimony of Policeman Morales who was called to the stand, notwithstanding the location of the car of the deceased there was sufficient room for two more cars.

That the defendant was driving exceedingly fast, notwithstanding being inside the urban zone and specially near the intersection of two streets, is shown conclusively by the fact that his car came to a stop after the accident quite a long distance from the car of the deceased, leaving behind traces produced by the application of the brakes for a distance of twenty feet, which traces began about twelve feet back of the car of deceased. The very testimony of the defendant and appellant shows that he was so oblivious of deceased

24

·when passing him that he did not even notice that he was ·close to the car. Let us see:

"Q. Did you say that when passing by the public car you felt the impact against the man?

"A. Yes, I felt the impact.

"Q. But before feeling the impact, did you notice the man there?

"A. I saw two or three people standing by the car.

"Q. But by the side of the public car in question?

"A. Yes.

"Q. Did you see the victim of the accident?

"A. I did not look at any other people.

"Q. But prior to the accident did you see the deceased by the side of the public car?

"A. I did.

"Q. Long before?

"A. Yes, quite long before.

"Q. How far?

"A. Well, from the curve, about sixty meters.

"Q. You mean to say that sixty meters before reaching the public car you saw the deceased fastening a bundle there?

"A. I did not notice what he was doing.

"Q. But you saw him well?

"A. I saw the car and the people standing close by.

"Q. About ten meters or ten yards before reaching the spot, did you notice him?

"A. Well, yes, the people.

"Q. Did you notice the man who was fastening the bundle?

"A. I did not notice anybody fastening a bundle; I saw the ·people at whom I looked intently because they were standing." (Transcript of Evidence, pp. 370 and 371.)

From an analysis of the evidence for both sides we can not agree with the appellant that the lower court committed manifest error in weighing the evidence.

█ It is urged by appellant that the death of Mangual was the result of taking him from the Municipal Hospital of Carolina to that of San Juan in a jitney. As a matter of fact he was taken to San Juan, but nothing appears from the evidence to show that his death was due to that or that he would not have died if he had been left in Carolina. There-

fore, this argument of appellant, based on a mere conjucture without support from the evidence, can not justify the reversal of the judgment.

 The trial court did not abuse its discretion by including in the pronouncement of costs the $300 item as attorney's fees. Having given credence to the evidence for the plaintiffs, the lower court could conclude that the defendant and appellant showed obstinacy in refusing to pay to the plaintiffs a reasonable compensation for the damages inflicted by him.

 It only remains for us to consider the $25 item of the memorandum of costs allowed the plaintiffs as professional fees paid to witness Dr. Comas. This witness, as appears from the record, was called to the stand to testify about the condition of Mangual on reaching the Municipal Hospital of San Juan, the treatment prescribed by him and his death. His testimony regarding the above particulars did not require from him any special preliminary preparation for testifying in the case. In such circumstances a physician, like any other professional man, is considered to be an ordinary witness and should not receive any other compensation than that provided in the schedule of fees for witnesses, that is, a $2 per diem. See section 327 of the Code of Civil Procedure. See also by analogy 4 *Wigmore on Evidence*, sec. 2203, pp. 682 *et seq*.

From the foregoing, the order approving the memorandum of costs shall be modified as regards the $25 item as fees for witness Dr. Comas, which must be reduced to $2, and so modified it must be affirmed together with the judgment appealed from.

Mr. Justice Wolf concurs in the result.